# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>4684 East Talmadge Drive, San Diego CA 92116 | )<br>)<br>)<br>)<br>)<br>) Case No. '23 MJ3880 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252; 2422(b) | Possession of Child Pornography; Attempted Coercion and Enticement of a Minor |

The application is based on these facts:

See Affidavit in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Aron Marcellus, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____ 10/26/2023 _____

_____
*Judge's signature*

City and state: _____ San Diego, California _____

Mitchell D. Dembin, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Aron Marcellus, being duly sworn, hereby state as follows:

### INTRODUCTION

1.     I, Aron Marcellus, am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

2.     I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity.  I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations.   These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes and bulk cash smuggling.

3.     Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

1

4. Since October 2019, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

5. This affidavit is made in support of an application by the United States of America for the issuance of a warrant to search the entire property located at 4684 East Talmadge Drive, San Diego, CA (SUBJECT PREMISES), within the Southern District of California, as described more fully in Attachment A, for the items described in Attachment B, which items constitute evidence, fruits, and instrumentalities of violations of Federal laws, namely, 18 U.S.C. §§ 2252 and 18 U.S.C. §§ 2422(b).

6. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers with decades of experience, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

6. On Sunday, April 9, 2023, at approximately 1:00 p.m., San Diego Police Department Officers responded to a report of a robbery at 3792 4th Avenue, in the city and county of San Diego. This location is a 7-11 Store. The radio call

stated a female was hit by a vehicle and her phone was stolen. Upon arrival, officers contacted the victim, a 16-year-old minor victim (hereafter referred to as MV). MV told the officers, in essence, that a male subject known to her as "Deondre" (later identified as Deondre Porter) and an adult female (later identified as Aaliyah White) (both charged elsewhere) physically assaulted her, strangled her, prevented her from leaving, and ultimately stole MV's cellphone out of her hand. Following, Porter and White left the scene. MV told responding officers that Porter is her pimp; therefore, Task Force Officers (TFO) with the San Diego Human Trafficking Task Force (HTTF) responded to the hospital where MV had been transported for treatment. During the course of the interview with MV, she identified Porter as her pimp/trafficker and described White as the bottom, or the pimp's most trusted prostitute under his control. Based on MV's statement and the totality of the investigation, it appeared Porter and White were violently sex trafficking her.

7.     On April 17, 2023, TFOs discovered that Porter and White were staying at a motel in the San Bernardino area. An investigator swore out a complaint for Porter and White and, later that day, both were apprehended without issue. At the time of their arrest, White was in possession of a black Apple iPhone with a black case. An investigator obtained a warrant to search the contents of that device. During the review of the contents of the device, an investigator located a text message thread between White and a phone number 619-500-9414 (hereafter -9414). The content of these messages included the user of -9414 offering a finder's fee payment to White if she could provide him with an underage prostitute. During the conversation, the user of -9414 described himself as "55. White." White used a nickname of "Kash" for their communication. The messages began on April 9, 2023, and concluded on April 16, 2023.

8.      On October 2, 2023, an investigator used a law enforcement program that generates a recorded phone line, and between October 2nd and October 4th, an investigator, acting in an undercover (UC) capacity, exchanged the following messages with the user of -9414.

UC:    "Hey baby its kash. New number. Gonna be in town next week with my friend maybe we can meet up this time."

-9414: "Ok!"

-9414: "How old is she?"

UC:    "You still looking for what we talked about last time?"

-9414: "Younger, yes"

UC:    "K"

-9414: "I'll pay well"

-9414: "Great"

-9414: "Now or later?"

UC:    "She my cousin and is wanting to get in this life but I don't want her to be putting herself out there on the net but she needs the money. Shes only 16 tho"

-9414: "Oh shit, yes!"

9.      As the conversation continues, the user of -9414 told the UC, "I'm 55, white, kinda fit," which is consistent with how he described himself to WHITE. Ultimately, the user of -9414 agreed to exchange either $150 for a "bbbj" (bareback blow job, or oral copulation without a condom) or $100 for a hand job (manual genital stimulation). He requested the act to be a "car date" (a prostitution encounter

4

that occurs inside a vehicle). This exchange concluded on October 4th with the user of -9414 stating, "Ok. Well I'm interested in her for sure!"

10.     On October 11, 2023, the UC messaged, "Hey baby" but did not receive a response until October 17, 2023. On that date, the user of -9414 began messaging the UC and ultimately the following exchange took place:

-9414: "Do you still have a younger girl?"

UC:    "Ya, my cousin I was telling u about"

-9414: "16?"

UC:    "Ya"

-9414: "Ok. I'm very interested"

11.     During the course of the exchange, the user of -9414 again requested the sex act of "bbbj" or a "3some" with his friend. The user of -9414 requested a "cardate" in the morning and asked for the UC's location. The UC responded that they were close enough to be in San Diego in a short amount of time. The user of -9414 again negotiated the exchange of $150 for "bbbj" with the fictitious 16-year old cousin.

12.     During the morning of October 18, 2023, the user of -9414 messaged the UC several times between 3:00 a.m. and 6:30 a.m. to the following effect:

-9414: "Wya" [where you at]

-9414: "???"

-9414: "Hello???"

-9414: "?????"

-9414: "Keep posted bbby"

13.     The UC responded on October 18, 2023 between approximately 11:46 a.m. and 4:41 p.m. with the messages below.

UC: "Hi baby, sorry about this morning. What do you think about this afternoon or can u only do mornings?"

UC: "We're planning to head to san diego"

UC: "So let me know baby if u want to see my cousin in the morning otherwise we're not gonna come down til later cause we wont have a room yet."

14.     On October 2, 2023, an investigator used a law enforcement program to determine the service provider of -9414 and learned that the phone number is a voice over internet protocol (VOIP) line registered to Pinger, Inc. On October 4, 2023, an administrative subpoena was served on Pinger, Inc. to obtain subscriber information and IP addresses associated to -9414. The records provided by Pinger, Inc. indicated that an email address of ss1642@yahoo.com was used to create the Pinger, Inc. account. Further, -9414 had been consistently assigned to this same account since March 2023. Using a law enforcement database, an investigator learned that Sean Stevenson (hereafter referred to as STEVENSON) is the user of ss1642@yahoo.com with an associated residence of 4684 E Talmadge Drive, San Diego, CA 92116.

15.     In analyzing the IP addresses provided by Pinger, Inc, an investigator noticed that 71.142.240.22 frequently appeared in the IP logs. Notably, this IP address appears during the timeframe in which the UC was receiving messages from -9414. A law enforcement records search of this IP address revealed that it is assigned to the internet service provider AT&T[1]. The amount of IP addresses captured for -9414 indicate that the user of -9414 is frequently using this line to communicate with others.

---

[1] This IP address was previously erroneously attributed, in prior submissions, to Verizon.

16.     The records provided by Pinger, Inc, identify the device associated with this account to be an Android device.

17.     California Department of Motor Vehicles records for STEVENSON revealed his home address as 4684 E Talmadge Drive in the city of San Diego and that he is the registered owner of two vehicles, a 2012 Mazda and a 1985 Volkswagen van, both also registered at this same address. STEVENSON's driver's license information indicates that he is a white male, 58 years old, 6'02, and 180 pounds.. On October 17, 2023, investigators observed both vehicles associated with STEVENSON parked in front of 4684 E Talmadge Drive in San Diego, California.

18.     Additionally, an open-source internet search of Sean Stevenson revealed a San Diego news article dated, March 25, 2022, stating that STEVENSON is an employee for San Diego Unified School District working at University City High School as a science teacher.

19.     On October 18th, 2023, an investigator used a law enforcement database for license plate readers (LPR) to determine where STEVENSON's license plate, CA/8RDW598 (2012 Mazda Miata) has been captured. The results revealed that on February 11, 2023, STEVENSON's Mazda Miata was captured ten times between the hours of about 1030 and 1200 from a LPR positioned on Roosevelt Avenue and W 2nd Street in the city of National City. Roosevelt Avenue is widely known as a blade, or public area where the solicitation for prostitution occurs, in part by communications within the pimping and prostitution subculture, but also through online forums used by sex buyer as well as newscasts to highlight the quality-of-life issue for the residents of San Diego County. Based on my training and experience, I know minors are frequently trafficked for the purpose of commercial sex, on the blade. Further, the activity of STEVENSON's vehicle passing by the LPR on

Roosevelt Avenue ten times in a short period of time is consistent with sex buyer activity looking for a prostitute consistent with their preference.

20.    On October 23, 2023, the user of -9414 re-engaged with the UC and continued the conversation by reconfirming that the user of -9414 still wanted to meet for a commercial sex date with the UC's 16-year-old cousin:

-9414: Are you still here in SD?

-9414: Mornings are best as it is safe, dark and quiet

UC: Yes baby we are

-9414: Do you want to try tomorrow am?

UC: And mornings are fine

-9414: What part of town you at?

UC: National City and ya tomorrow sounds good baby

-9414: Ok, and $150 for cardate bbbj. No condom.

-9414: Also, can you send a pic of your cousin please? (lips emoji)

-9414: Sexy pic

21.    The conversation subsequently continued with a discussion of whether the morning date was confirmed:

-UC: want to meet in the morning then or no?

-9414: Yes, can I see u first?

-UC: what do you mean, like a pic?

-9414: No, get a bbbj from u

-9414: How old r u?

-UC: im confused lol. u wanting a bj from both of us tomorrow?

-UC: and im 20

-9414: Lol. Nope. Either

-UC: K. are u coming to us baby or are we meeting u somewhere?

8

-9414: I cone to u.

-9414: Will u both be out on the blade?

-UC: k. and yes baby of course

-9414: Ok

-9414: I'll text u in the morning

22.    On October 24, 2023, the user of -9414 and the UC exchanged messages regarding the user of -9414 coming to meet the UC for a commercial sex date with the 16-year-old cousin. The UC provided the address of 5380 El Cajon Blvd. in the city of San Diego, California to which the user of -9414 replied, "what is she wearing" (referring to the 16-year-old cousin). The user of -9414 also renegotiated the commercial sex date to be $140 for oral sex. At approximately 7:00 am, STEVENSON arrived at the location in the Mazda Miata bearing CA license plate 8RDW598. TFOs conducting surveillance observed STEVENSON drive to the east of the parking lot where STEVENSON had a full unobstructed view of the meeting location. TFOs observed STEVENSON drive laps near an apartment complex behind the location from where the user of -9414 had been told the 16-year-old would be arriving. Shortly afterward, STEVENSON was stopped and placed under arrest.

23.    During the arrest, TFOs observed $140 USD in the driver's side door storage area. During a search incident to arrest of STEVENSON's vehicle, TFOs discovered a black Samsung smartphone underneath the driver's seat.  Shortly afterward, a post-arrest call was placed to the -9414 number with which the UC had been exchanging messages. The black Samsung smartphone began to ring and the incoming phone number displayed on the black Samsung smartphone's screen was the one associated with the UC account.

24.    On October 24th, an investigator swore out a search warrant for the black Samsung smartphone. On October 25th, using the cellphone forensics Kiosk at the California Department of Justice San Diego Regional Office, an investigator extracted the contents of STEVENSON's black Samsung smartphone. The investigator viewed the photos and videos on his physical cellphone in the deleted folder which depicted what appeared to be child sexual abuse material (CSAM). An investigator confirmed those same photos and videos were captured in the extraction as well. The videos included the underdeveloped females performing oral copulation on an unknown male and exposing their genitalia (vagina) to include masturbation.

25.    During the above-referenced October 17, 2023 observation of the residence at 4684 E Talmadge Drive, San Diego CA, an investigator walked by the front of the address while scanning for Wi-Fi networks and noticed an AT&T wireless network was the third identified network; all three available networks had the same signal strength. On October 19th, 2023, an investigator searched the AT&T home internet service area on their website. Upon entering the address 4684 East Talmadge, SD, CA 92116, the investigator received a notice stating "Great news! AT&T Fiber is available, but an account already exists at this address."

26.    As a result of my training and experience, and the training and experience of other law enforcement officers working investigations involving child exploitation and child pornography, with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt, distribution and possession of child pornography.

a. These individuals may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasizing while viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. These individuals may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, sliders and/or drawings or other visual media. These individuals often use these materials for their own sexual arousal and gratification. Furthermore, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. To the extent these individuals possess and maintain "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., they almost always maintain those hard copies in the privacy and security of their home. They typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and video tapes for many years. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

d. Likewise, these individuals often maintain their digital or electronic collections of child sexual exploitation images in a safe, secure, and private environment, such as a computer and surrounding area, or on cellular telephones. These collections are often maintained for several years and are kept close by, usually at the individual's residence, on his or her person, or in his or her vehicles, to enable the individual to view the collection, which is valued highly.

e. These individuals also may correspond with and/or meet others to share information and materials; are rarely able to completely destroy correspondence from other child pornography distributors/collectors; conceal correspondence as they do their sexually explicit material; and often maintain lists

of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f. These individuals prefer not to be without their child sexual exploitation images for any prolonged time period. Collectors will take their collection with them if they change residences, as the collection is considered to be a prized possession. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. That said, there are individuals with a sexual interest in children who download and view digital images of child sexual exploitation and delete it in order to avoid detection by law enforcement or other people. However, even in cases where these images are deleted, or concealed via encryption software, forensic examiners can use specialized tools to recover the deleted files or access encrypted files.

g. These individuals often use specialized software to conceal the existence of evidence and/or destroy said evidence. There are a variety of different programs that an individual can use to accomplish these objectives, many of which are free. Additionally, these individuals have been known to store child pornography in unconventional physical locations, as well as in unusual digital locations on computers and cellular phones. These files and folders, or applications, have been misnamed or renamed in an attempt to mislead investigators.

h. These individuals will often download and store images of children they know or with whom they have communicated, as well as their communications with those children. The images may not necessarily be pornographic or obscene in nature; however, they are often used for the individuals' sexual gratification.

27.   The person(s) residing at the SUBJECT PREMISES exhibits the common characteristics described above of someone involved in the distribution, receipt, possession, and accessing of child pornography, as evidenced by the facts set forth in this Affidavit. Specifically, the individual attempted to pay money for

12

oral sex from a 16 year old and possessed on his cellphone, videos and images depicting minors involved in sexually explicit conduct.

28.    Based upon my training, experience, and consultation with other law enforcement officers and supervisors with decades of experience, I know that cellular phones and other small electronic devices such as thumb drives and SIM cards can be stored in various places, including in storage locations and vehicles.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO THE COMPUTER AND OTHER ELECTRONIC STORAGE DEVICES**

29.    With the approval of the Court in signing this warrant, Agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, which may contain data subject to seizure pursuant to this warrant:

<u>Seizure and Retention of Instrumentalities</u>

a.    Based upon the foregoing, there is probable cause to believe that any computers and other electronic storage devices encountered during this search are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2), Fed R. Crim. P., or were used in committing crime as provided at Rule 41(c)(3).  Consequently, the computers and any other electronic devices are subject to seizure, retention, and possible forfeiture and destruction.  Computers, other electronic storage devices, and media confirmed onsite to contain contraband, constitute fruits of crime, or to have been used to commit crime will not be returned but will be imaged offsite and analyzed as provided beginning at subparagraph (c) below.  The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any

13

contraband or otherwise is an instrumentality. Computers and other electronic storage devices and media that are not confirmed onsite as instrumentalities will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (b) below.

   b. The offsite imaging and preliminary analysis of computers, other electronic storage devices, and media to confirm their status as instrumentalities will be conducted within forty-five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the Court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

   c. Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g), Federal Rules of Criminal Procedure.

<u>Identification And Extraction Of Relevant Data</u>

   d. A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process

requiring specific expertise, equipment, and software.  There are literally thousands of different hardware items and software programs, and different versions of the same program, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e.      Analyzing the contents of a computer or other electronic storage device, even without significant technical issues, can be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process.  The computer may have stored information about the data at issue: who created it, when and how it was created, downloaded, or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.  Sometimes it is possible to recover an entire document that was never saved to the hard drive if the document was printed.  Moreover, certain file formats do not lend themselves to keyword searches.  Keywords search text.  Many common electronic mail, database, and spreadsheet applications do not store data searchable text.  The data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.  To determine who

created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computer or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting as the keyboard.

f. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data.  Computers generate substantial information about data and about users which generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies, and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars, and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g. Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has been mind-boggling.  For example, as single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage

space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing terabytes (1,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.  And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

h.      Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process may take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within one-hundred and twenty (120) days from the data of seizure pursuant to this warrant, absent further application to this Court.

i.      All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO ANY CELLULAR TELEPHONE**

30.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such

as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

31. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

32. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## GENUINE RISK OF DESTRUCTION OF DATA

33.     Based upon my experience and training, and the experience and training of other Agents with whom I have communicated, it is not uncommon for technically sophisticated criminals to use encryption, programs to destroy data that can be triggered remotely or by a pre-programmed event or keystroke and sophisticated techniques to hide data.   In this case, only if the subject receives advance warning of the execution of this warrant, will there be an elevated risk of destruction or concealment of evidence.

## PRIOR ATTEMPTS TO OBTAIN DATA

34.     The United States has not attempted to obtain this data by other means.

## CONCLUSION

35.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violation of 18 U.S.C. §§ 2252 and/or 2422(b) may be located at the SUBJECT PREMISES described in Attachment A.  I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

_____
Aron Marcellus, Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of October, 2023.

_____
HONORABLE MITCHELL D. DEMBIN
United States Magistrate Judge

## **ATTACHMENT A**

## **DESCRIPTION OF PREMISES TO BE SEARCHED**

The property at 4684 East Talmadge Drive, San Diego CA 92116, in the Southern District of California, a two story single family residence, having primarily white stucco exterior, with beige painted trim, red Spanish tile roof, having the numbers "4684", affixed to the east wall of the residence to the left of the main entrance/front door. The home is located on the west curb line of E Talmadge Drive between Adams Avenue to the north and Short Street to the south. The front door faces east onto E Talmadge Drive and is brown in color. The front door does not have screen of any type.

The premises to be searched includes the residence and any outlying structures or storage areas associated with the premises, as well as any vehicles parked on the premises, or immediately in front of the premises, which belong to individuals residing at the premises.



## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization is sought to search for and seize evidence that relates to violations of 18 U.S.C. §§ 2252 and 2422(b).  Authorization to search includes any detached structures from the primary premises, if such additional structures exist.  This authorization includes the search of physical documents and includes electronic data to include deleted data, remnant data and slack space.  The seizure and search of computers and computer media will be conducted in accordance with the "Procedures For Electronically Stored Information as to Computers and Other Electronic Storage Devices," provided in the affidavit submitted in support of this warrant.  Items to be seized include the following:

       a.     Computer systems, software, peripherals and data storage devices.

       b.     Documents, including temporary and permanent electronic files and records, (including, but not limited to, JPG, GIF, TIF, AVI, WAV and MPEG files) which contain, attach, or describe child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

       c.     User-attribution data to include data reflecting who used or controlled the computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed.  User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.

       d.     Materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings relating to children.

e.      Records or documents that shows the offer to transmit or receive any depictions of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.      Electronically stored communications or messages reflecting computer on-line chat sessions or e-mail messages with any persons regarding the possession, receipt, distribution, and/or reproduction of child pornography, as defined in 18 U.S.C. § 2256.

g.      Documents, records, programs, or applications that identify the residents or the subject premises and to identify the Internet service provided to the subject premises.

h.      Information that identifies the occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; credit card information including but not limited to bills and payment records.

i.      For any computer hard drive or other electronic media found to contain information otherwise called for by this warrant:

(1) Evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software;

(2) Evidence of the lack of such malicious software;

(3) Evidence of the attachment to the computer of other storage devices, disks, CD-ROMs, or similar containers for electronic evidence; and

(4) Documentation and manuals that may be necessary to access or conduct an examination of the computer

j.      Information relating to the install date of the device's operating system, presence of file-sharing programs (including install date, whether the program was setup for sharing, etc.) or other programs for distribution of electronic files including for child pornography or visual depictions of minors engaged in sexually explicit conduct.

k.      Usernames, e-mail accounts, or online identities that may have been used for the sexual exploitation of children.

l.      Cellular telephone device and storage devices, such as SIM cards or memory devices attached to, inserted in or seized with the device, will be searched and seized in accordance with the "Procedures For Electronically Stored Information as to Any Cellular Telephone" provided in the affidavit and submitted in support of this warrant. The following data will be seized only to the extent that it contains evidence of violations of 18 U.S.C. §§ 2252 and 2422(b), such as communications, records, or data, including emails, text messages, photographs, audio files, videos, or location data:

(1)     tending to indicate efforts to send, receive, or possess child pornography, as defined by 18 U.S.C. § 2256;

(2)     tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain evidence of efforts to send, receive or possess child pornography, as defined by 18 U.S.C. § 2256;

(3)     tending to identify co-conspirators, criminal associates, or others involved in sending, receiving or possessing child pornography, as defined by 18 U.S.C. § 2256;

(4)     tending to identify the user of, or persons with control over or access to, the subject phone; or

(5)     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data described above.